Case number 10-2877, consolidated with 10-2878 and 10-2897, Virginia Choice v. Visionquest Association And let the lesson for this one be, tell us what we need to know right now. If the lawyers would please identify themselves for the record. Good morning, Your Honor. This is David Rappaport on behalf of the Athons Plaintiffs, and I will also be making the first portion of the argument for the appellant. Good morning, Your Honor. Our Justice is Kevin Taylor, also appearing on behalf of the appellants, but I'm appearing on behalf of the YMCA. Good morning, Your Honor. This is David Austin on behalf of the Defendants, Athletes, North Lawndale College Preparatory Charter High School, and the Board of Education for the City of Chicago. Thank you. And so for the appellants. Thank you, Your Honors, and good morning. I'll do my best to rise to the challenge of getting right to the heart of the matter. Judge McWilliams' ruling... I won't tell you, but that's what they all said. Yeah, sure. We'll see. I'll do my best. So Judge McWilliams dismissed a lawsuit on tort immunity grounds, finding the absolute immunity that is set forth in Section 3-110 of the Tort Immunity Act applied to this case. The central point that I'll be speaking to is that we believe that it is Section 109, not 110, that should apply to this case. We believe that this case... But what if 110 doesn't apply? Well, 110 is an absolute immunity, so if 110... So you agree that under 110, no willful lying will help you prevail? Right. One of the big differences, putting aside choosing which applies, one of the big differences is 110 is an absolute immunity provision, and proof of willful wanting is not an option. So if we hold that 110 applies, you're conceding that you've moved? I am, unless Mr. Taylor has another answer to that. I believe that 110 is clearly an absolute immunity. So there are other issues, but I'm going to stick with the statutory interpretation issue, and I put at the center of that the clear applicability of Section 109. Now, what are the criteria for one if the Supreme Court refers to trumping the other? Why would 309 trump 310 when 310 involves events occurring in a body of water and 309 applies to hazardous events in which some of those events may be in a body of water, but it's nestled in with a slew of other events that take place all over the terrain and in the air? Yes, of course, Your Honor, and I think the best answer to that is the holding in the Murray case by the Illinois Supreme Court requires it, in our opinion. Murray dealt with the 110 immunity, the waterways immunity, and it found that a more specific statute would trump 110. And in this case it is our contention that 109 is more specific because it deals with hazardous recreational activities and because it clearly applies to the facts of this case. There's no question that if both provisions apply, you have a legal issue. Now, when you say 109 applies, you're presuming that the paddle boats are a hazardous activity, where your opponent clearly suggests that these paddle boats are routinely used by children, adults, people without any training in boating or sailing or any kind of skilled activity. And so how do you convince us that this is a hazardous recreational activity? Okay, so my first way of... Is it a water contact sport? Is paddle boating a water contact sport, which is the activity delineated as B1 of 109? Yes, it is, and coming to your... It is? It is a water contact sport. You would say definitively that the use of a paddle boat is a water contact, simply because there's contact with the water? Yes, I would think so. I mean, it had not occurred to me that it would not be a water contact sport. When you conceded that 310 would basically vanquish you, were you throwing in the towel on your approximate cause argument? I'm not intending to throw in the towel on any argument that we articulated, but I'm not sure that I completely understand the question. Our central contention is that when we start with 109 in answering Justice McBride's question, first of all, we start with its plain language, and I would be happy to walk through the plain language here. I don't think the YMCA is going to concede that 110 doesn't have the Willful and Watson misconduct provision applied. I don't think they're going to take that position. That's not what's in their brief, but you're not representing the client. Yes, I have my doubts about whether they will disagree with what I said. So, trying to get to the heart of your question, the first answer is 109's language fits like a glove, and the trial court made a mistake that I don't think the school board will even try to defend, and the mistake is simply in ruling that you must be on the property of the local public entity for 109 to apply. 109 section B doesn't say that. It starts by saying that, but then it says it also applies, and it lists a variety of activities that fit here. So, I definitely think that having 109 before us, and I have copies to distribute if it's not conveniently accessible to anybody, but 109's structure is quite clear, and I haven't seen anybody attempt to defend the ruling that it has to be on the local public entity's properties for 109 to apply. That's the sole basis that Judge McWilliams set forth for concluding that 109 did not apply. But the heart of the matter, as you put it, is really whether 109 or 110 is the more specific provision, because that, in your mind anyway, determines whether or not willful and wanton is a possible exception to the immunity. And so, maybe the focus needs to be more specifically on which of these two really is more specific in its statute. Yes, and I'm happy to address that. I didn't want to start there, because obviously proving 109 is applicable to is an entry to that next point. So, let me hit that next point on the head. I haven't seen the school board attempt to meaningfully distinguish the Murray case, which this Court is duty-bound to follow, and I haven't been able to find a good way to distinguish it myself. So, we have just a description in here. It's not four square, but we were comparing a specifically applicable provision. It dealt with 109. It dealt with a spinal cord injury involving a trampoline competition. Trampolining is specifically mentioned as a hazardous recreational activity. Yes. And in 109, so is the type of activity that we're talking about here. What would you refer us to? Okay, let me just get this. I'm looking at 109. Okay, that's great. Okay, so 109 defines hazardous recreational activity, and if we look at the portion that says, also means, number one, water contact activities except diving in places where or at a time when lifeguards are not provided, and reasonable warning thereof has been given, or the injured party should reasonably have known that there was no lifeguard provided at the time. Let's just stop there for a second. Okay, but earlier it's defined too. What does hazardous recreational activity mean? Recreational activity conducted on property of a local public entity which creates a substantial, is distinguished from a minor, trivial, or insignificant risk of injury to a participant or a spectator. I totally agree with you. I mean, in this case, we know that these paddle boats, what happened here was that the plugs were removed and they were taking water. Right. Okay. Right. That's what made, I mean, that's part of the reason, and isn't it kind of clear that were it not for the release of the water into these paddle boats that this incident wouldn't have occurred? Apart from the, in addition to, of course, your claims of lack of supervision, I mean, there's plenty. Yes, I fully agree with you that in all probability these deaths would not have occurred if the plugs were in the boats. Having said that, though, there were no personal flotation devices which are required by statute. Go back for a minute to the Murray case. In Murray, what competition did 109 get from any other provision? It was the absolute immunity of 108. But 108, as opposed to 110, is a general lack of supervision statute as opposed to 110, which is specific for injuries occurring on or adjacent to waterways, lakes, and ponds. 109, by its very nature, it is specific, while 108, by its very nature, is generic. Just geared to supervision. Now, in competition, comparing 109 to 108 may very well make 109 the more specific with respect to trampolines, since it mentions trampolines, but when comparing 109 to 110, activities on the water, as opposed to various hazardous activities, one of which was mentioned to occur on water, that in that instance 110 seems to be overshadowing 109. Okay, I'm happy to speak to that. 108 is not just supervision. It's supervision on the land of a public entity. It's a very broadly applicable statute, and 109 trumped it because it mentioned trampolining. Look, the waterway statute in 110 applies to all the water that there is. Yes, but we know that there's a different intent with 110 because the legislature excluded this willful and wanton exception. Well, the legislature had done so with 108. That's what Murray was dealing with. 108 has been amended since Murray was before the court, so it was absolutely a comparison between absolute immunity. Aren't you really asking us to compare 109 with 110? I am, but I'm pointing to the Murray's case logic. The analogy is not as clear-cut as your confidence in it seems to be. Well, I'm here as an appellant, so maybe not confidence, maybe an adherence. Yes. No, I believe. I don't make a point of arguing ad hominem counsel. Sometimes it's too tempting. Well, listen, I respect that because you're right. It seems to me that 109 specifically lists certain type of activities that occur on waterways, that 110 lists all activities on waterways. So I don't think it's a great leap to say that 109 is more specific because it only applies to hazardous recreational activities on waterways, whereas 110 includes that and many other things. And when it's a hazardous recreational activity that fits the definition of 109, we at least intend that... Do you again have a real problem if we conclude that this is not a hazardous recreational activity under 109? Well, we would. So let me speak to the question of why it's a hazardous recreational activity. We have 41 degree water. We have no personal flotation devices, even though those are required by safety. We have an overriding statute that requires... So wait, the hazardous activity depends on the temperature of the water? Well, it can. I mean, wait, think about this. So if it was earlier in the day, it wouldn't be hazardous, but if it was later at night when the temperatures go down, it becomes hazardous? Well, in November, that's not an issue. Isn't that a logical extension of your argument? I don't think so because in this situation with those paddle boats and their absence of bugs and the freezing cold water 24-7 during that time of year, that was an important factor in these routes. People couldn't last very long in that water. Is it also important to your equation that you look at the complete definition of hazardous recreational activity, which includes that that be on the property of a local public entity, and does that local public entity have to be the Chicago school district? Well, my answer to that is that the legislature put in hazardous recreational activity also means they inserted the word also right after the paragraph that started with on the land of the local public entity. And by choosing the word also, I believe that the legislature precludes the interpretation that for 109 to apply, it always has to be on the property of the local public entity. It could have used unless, right? It could have used an unless if your interpretation was right. Lay that out for me. Well, this exclusion, this immunity would apply unless it was not on the land but otherwise covered. I think so. I mean, I'm having a little trouble following the language, but I think the legislature could have clearly said that this only applies on the land of the local public entity, and I think they didn't do that. But they do that at the beginning. My question to you is, is this requirement, you're saying it's completely missing, that it doesn't have to be on the property of the local public entity? Do you have any solutions that help you there? Well, no, because there are very few cases that we found addressing the question. But I can tell you this, if a gym teacher took kids from the Chicago Public School District down to Oak Street Beach in the wintertime and put them in 40-degree water with no life jackets and they all drowned, let's say it was a swim team teacher like the one I had up at Bathur who wanted you to swim until you spit cookies, which was probably dangerous, would you really be concerned that it's not a hazardous recreational activity because it wasn't on school property? I think we'd be looking at the whole statute. I think we'd be looking at the entity that was sued. I think we'd be looking at whether or not the city of Chicago, that this was property of the local public entity. I do. I think that the waterway, where it occurs, makes a difference. And waterway or river or lake, Lake Michigan, versus a swimming pool and teachers bringing the students to the lake. I mean, there's a lot of issues here. There are, and we have briefed other things like 110 should not apply to non-riparian local entities. We have some support for other arguments. I just chose, because time is limited, to focus on what seemed to me to be the clearest thing, and that is that Judge McWilliams, who's a fabulous judge and who's still presiding over this case, interpreted the statute without discussing it. She just sweepingly said 109 doesn't apply unless it's on the property of the local public entity. We've strained to read the statute and get the change. Two things you relied on. Let's talk about that then. The supervision. The supervision aspect of this. How was the Chicago School District supervising the waterway? You say it doesn't have to be the waterway. You rely on cases where the court said that it does make a difference, whether it's the supervision of the activity versus the group. Right. This lies in the face of brain abuse. Yes, we understand that, and I haven't gone to those arguments. I'm happy to. Those arguments aren't reached if one looks at 109 as applicable and as the logic of Murray extended to this situation requiring that it trump 110. When we get into the question of putting all of those arguments aside, what about 110? Does it apply? And what's the supervision we're talking about? Let me just hit that nail on the head. The Chicago Board of Education, through its agreement with the YMCA, through its own internal policies and through YMCA policies that it embraced, was required to have an 8 to 1 ratio, meaning because we have 31 students, 4 adults sleeping in the ward house with those kids. They didn't have that. They broke the rules. That occurred on the land. A consequence of it was that the kids went out one night, took a paddle boat, managed to do it safely. It floated off to the other side. None of the teachers involved with this either discovered or acted upon what they knew, although there is some evidence. And bear in mind, this order was entered at the front end of this case. The case against the Y is still proceeding below on stage, so we know a lot more about the facts of this case today than we knew when this record was created. So for purposes of, you know, you have complaints, and I'm sure you realize you have three different complaints before you that you're looking at for 2619 purposes. The consolidated death complaints, the complaint by the injury, and the third party complaint by the Y. Is this, just to clarify, this was a 619 case without any extrinsic submissions? Is that right? So it wasn't the fact motion. It was actually a pleadings motion that could have been decided under 615E, judgment on the pleadings, right? It's more right than not, but it's not 100% right. There are various pieces of facts. There's the contract with the YMCA that's before the court. How are they submitted? Well, they were submitted as exhibits to the complaints. Well, exhibits to a complaint are part of the complaint. In part, but there are some affidavits and other things. There's not a large body of factual evidence. It's important to know that in terms of structuring whatever decision we write up. Right. I can give you a specific list of what's out there. But the briefs seem to indicate that there were no extrinsic submissions. Well, there was a Linda Fouser affidavit. She was the camp director who said the 8 to 1 ratio was required. Was it along with the motion, or was that in-depth attached to the pleadings? Because that's an important consideration. I know. The affidavit was not attached to the pleadings. It was part of the motion. And it repeated a principle that is contained in some of the documents that were attached to the pleadings, which is the 8 to 1 ratio. That required ratio is not a contested fact for purposes of this appeal. And the fact that the school board broke rules I really don't think is a contested fact, although the board may well say it's contested. But for your purposes, taking the evidence in the light most favorable to us, these facts are in the complaint. We have tremendous detail. I refer you to the first consolidated complaint for much of it. But those facts only have bearing on the issue of willful and wanton and on the issue of proximate cause. Right. They don't in terms of even if there is otherwise a breach falling short of being willful and wanton, a breach of duty would not impact. And, in fact, obviously that's what the immunity is designed to give protection. Right. But the allegations certainly are broad enough to include accusing the teachers of actually knowing about this activity and not acting or that they should have known and breaking rules. In terms of your willful and wanton. Yeah. But my point is 2619 is no remedy. The complaints are rich with facts. And 2619 is really not the place for a detailed heavy weight. My question, I suppose, is, well, first, since you've already touched on this, is somebody else going to be arguing the willful and wanton issue for you for your time here? Or are you? I'm speaking to all of the cases. Well, if you want, then I will proceed to ask you. Absolutely. I'm happy to address it. If the fact that the accident here, the drowning, occurred as a result of the failure to replace the plugs, the failure to replace the plugs in these paddle boats was strictly a duty of the YMCA. The paddle boats didn't belong to the school district. You're not trying to extend the duty on the part of the school district to replace the plugs. I'm doing some unauthorized paddle boating with them. Is that right? You're correct. And I would add to it that the source of the duty is statutory. The Board of Education had a dual duty. To provide supervision. Supervision and maintain discipline. I understand. But if the accident would not have occurred but for the failure to replace the plugs, in terms of its foreseeability, it becomes very attenuated. Because the idea of foreseeing that, first, these students, notwithstanding their seizure of these boats on November 10th, would nevertheless proceed to seize them again on November 14th. And that might be foreseeable. Okay. And the question is, does it become reckless if the only injury, if the source of the injury was dependent upon the absence of the plugs? Was that something foreseeable? And if that wasn't, doesn't that cut the chain for finding willful, wanton, or reckless behavior disregard for the safety of others? Or can we find that reckless conduct insofar as the failure to provide supervision and supervision causing any kind of breach of the rules by the students, even though this breach, which caused their injury, involved knowledge of what happens inside YMCA boats? So you ask an excellent question. It hits on the difference between the legal aspect of proximate cause and the fact aspect of proximate cause. The specifics of how the kids may have drowned in the Fox River did not need to be foreseen by those who were supervising and maintaining discipline. There is a river down there that was dangerous. It could have been some sand man. So even if there was a man who came out of the movie Deliverance lurking in that river and capsizing the vessel, that willful and wanton misconduct is still attributable to the school board because had they provided the guards, these students would have remained in their beds smoking their little reefers underneath the cover. The good news is these kids actually were all toxicology clean and gifted students from a charter program. But you're right. Look, Your Honor, I'm not going to challenge the idea that there's such a thing as the legal aspect of proximate cause. I'm not asking you to hold anybody guilty of anything. All we're trying to do is obtain our right to convince a jury that the board was guilty of willful and wanton conduct and that a fully developed... But generally... I'm sorry. Generally... Ladies first. Generally would the pleading of the lack of eight to one supervisors in the cabin while these children were supposed to be asleep, that that lack of having the ratio meet the test of willful and wanton misconduct? Yes, on the conscious disregard aspect given the dangers, the magnitude of the dangers we're dealing with. And isn't it generally speaking that the lack of the number of chaperones... I don't know what case you would suggest would support this utter disregard. Let me... There are a number of Supreme Court cases that address the standard. But let me speak to what we're really talking about here. The parents of these children, most were minors, entrusted their safety predominantly to the Chicago Board of Education and also to the YMCA. These are city kids that were not used to being around rivers. There's nothing shocking. The mention of... Rivers are in the city. There's a lake in the city. There's rivers in the city. And if you had eight people in there as chaperones, in your theory, to avoid willful and wanton, does one of them have to stay up all night? No. But what they do have to do is follow the mandatory rules that they broke. And the significance of those rules that were violated and to what extent they caused or contributed to cause these deaths in the first instance present classic examples of triable issues of fact that somebody other than this court should resolve in the first instance. And I would add that judgment... I like that. Okay. It would support this lack of numbers of supervisors in the particular cabin where... How does that translate to the utter disregard when these paddle boats have plugs that are missing? Well, there's expert evidence... That nobody even knows about. Even the child that took one out a few days before didn't even recognize that the plugs weren't in there. We have the ability to present a very highly developed factual record with expert opinions... Of course, the ability has to pass through twice. Once, the first time, in establishing the duty, it's for the judge. Sure. The second time, in establishing the breach of duty, it's for the jury. We're talking about the first time. I know. Is it foreseeable so as to establish a duty on the part of the school to prevent these students from securing unplugged scuttle boats or whatever, when, in fact, the presence or absence of the plug is, as a matter of law, it seems, outside the orbit of anyone but, perhaps, the YMCA. I'm not here to necessarily make a finding with regard to the YMCA, but it's certainly not something that... It's easily ascertainable, it seems on review, that the foreseeability of the plugs is insufficient to create a duty, if that's what it depends on. Well, Justice Gordon, I think a policy question comes up, because the judge who should really be passing on this issue is the judge most familiar with the case, and I'm probably a more fully developed... Not if it's a matter of law. You have a right. Not if it's a matter of law, based on the facts. Okay. Are you agreeing that, in some way, the decision hangs on the foreseeability of these plugs? No, but I'm agreeing that I can't anticipate how you will see it. So, if it were me, I would... Doesn't your own complaint allege that they were hidden, that this danger was hidden? That the missing plugs... The danger of the plugs. The missing plugs, yes. The fact that there were unchained paddle boats close to the river. The fact that there was a river. The fact that it was November. Those things were not hidden. No, but the unplugged... Is there any question that the paddle boats took in water as a result of the plugs not being included? It is alleged, and it is true, that the paddle boats lost stability because the drain plugs at the bottom of their pontoons were not in them. That is certainly a fact, and I'm not running away from the fact at all. Nor am I running away from proximate cause. I'm just pointing out that, in the trial court's view of this, she never reached that. We have plenty of facts alleged, especially in the first consolidated complaint, that goes directly to what the danger was and the foreseeability issue. From paragraphs 21 through 45 or so of that consolidated complaint, there's a great deal there. I think that the court is familiar with proximate cause, and it's certainly true that there's a legal aspect that we have to... If the duty is contingent upon a chain of contingency, then the strength of the conclusion as to whether there is or is not such a duty will depend on the weakest one of those contingencies. If, in this case, that contingency is the existence of the plug, then I think your opponent would take great comfort in that. Respectfully, I would say that the duty is statutorily described in the school code, that the issues here involve the breach of that duty and involve whether that breach was a proximate cause of what occurred. I would respectfully suggest that when it comes to breach and when it comes to proximate cause in the case of a statutorily described duty, that it is better policy to allow the trial judge to weigh that. So in the point of fact, it's not very clear. No, I understand. And is it something for us to decide? It's not as if we're anxious to decide. I understand. But as far as you decide. If you reach it, it is our contention that those complaints plead as much as the law requires in order to establish a duty breach and proximate cause. Anything further you want to add? Okay, thank you for listening to me, Your Honors. Thank you. Mr. Taylor? Thank you very much. On the breach, most everything seems to have been covered. I would like to point out, as Justice McBride did, we dispute that the willful and wanton, that 110 is absolute immunity. We think it should not be. And we think it should include willful and wanton behavior. I also want to say one other thing, if I may. I'm not sure I'm following you. Are you agreeing that 109 trumps or 110, or are you saying the opposite? We would take the position that 109 trumps, but to the extent 110 doesn't trump, it is not, and it should not be afforded by this court, absolute immunity. It's obvious on the face of the statute. It doesn't include the exception for willful and wanton. Now, why would not 310, if it does apply, summarily decide to dispute? Well, several reasons. Number one, it should not provide absolute immunity. But 310 does. If it applies, then it does supply absolute immunity. Subject to how this panel interprets 110, that's exactly right. Well, what else is possible? Well, to say that the legislature erred, and it's unconstitutional. That's exactly right. But don't you also take the position that it's included somewhat by implication? You're arguing that all the other provisions have it. I mean, I thought that was part of your argument. That is part of it as well. The absence of the language doesn't mean that the legislature didn't intend for the willful. That's exactly right, and that's on page 7 of our reply, which is no doubt what you're referring to in part. The other thing I want to say is boating is an inherently dangerous activity. I know what you're thinking when you think about a paddle boat. They seem like these innocuous things we see at the state fair with little kids paddling around on them. But they're not. Like most watercraft, they have plugs that are to be removed in the wintertime. Like most watercraft, they require instruction. And like all watercraft, they require a litigation. Well, I'm only suggesting that this is a Supreme Court case, and I can't recall what it is right now that specifically says that boating is not a hazardous activity. I'm hopeful that perhaps your opponent might be able to dredge that up. Well, I'm hopeful he can't. I'm certainly not aware of it. With your position, is there anything involved in any waterway, lake, that is not a hazardous recreational activity then? The answer is potentially there are some things that are not hazardous. What would those be? I would say that under proper supervision, using a beachside-type situation with sand and beach where there's no waves would be generally considered not hazardous. But any time you take a watercraft out on a lake or a river. If I might interrupt here, and I think once I do, you'll see why I'm doing that. Wouldn't you interpret V1 as being contrary to what you just said? Wouldn't any water contact activity be hazardous? Yes, because we're not talking about something hazardous in the vernacular of what is common sense to call hazardous. At this point, we're talking about what the statute designates as hazardous. The statute clearly says that any contact with water can be hazardous, and then parenthetically points out as long as it's not a trivial or menial type of hazard. That's obviously, to me, a question of fact, and that's part of the reason why the dismissal at this stage of the proceedings was premature in our opinion and should not be sustained by this court. I would also add this. The notion of willful and wanton in this particular case as it's been pled by the plaintiffs and also in the pleadings made by the YMCA is not limited to the notion that it's just going to 110 in trying to establish a willful and wanton standard for either 109 or 110. It goes to control and supervision. This is why this case is a little unique. By the way, we all know that there's only been two cases that interpret 110, McCoy and Frank, right? So, directly interpret, talk about the statute in that context. Neither of those cases involve a situation where the public entity was a left fee. Here, the public entity, the North Lawn Dale Public School and the Board of Education contracted with the YMCA to take over the camp for five or six days. They didn't contract to take over Fox Lake because Fox Lake doesn't belong to any of those entities. It belongs to the specific administrative body designed to regulate and administer that lake. Right, but follow me through here because the devil's in the details is the word take over, all right? No, they didn't contract to take over the lake, the river, excuse me. They did contract to take over the camp. And so, the statute recognizes that it's not just ownership, it's control, supervision, maintenance. These are fees of the river and the riverfront. Of the river. I don't see the riverfront being a factor in 110, but I see the river. I can't see the YMCA ever conceding that it had any ownership, supervision, maintenance, operation, management and control of that river. What we did is we gave the state all of the rights we had. Right. And whatever we had, we had the right to use the river, we had the right to enjoy the river, we had the right to... We had the right to use the river because those who were in charge of administering the river permitted you to use it. It's not because the YMCA or the school permitted you to use it, because you could have been overruled there by the administrative agency that actually regulates that waterway. Presumably, they could have said who can and can't use the river. So the right to use the river applies to the individuals, not to the body of water itself, which is obviously transcendently controlled by the agency point of design to regulate it. Here's why I'm troubled by such an unequivocal and frank application of 110. If you look at the frame case, they repeat on three or four different occasions, there was no contract, the firefighters were not told by the club what to do, there was no written agreement, they paid no fee. So they're clearly distinguishing between the club and the firefighters. Here, the school took over whatever we had. But did you have? Did you have? Does the YMCA? I mean, the YMCA obviously did not own any part of this. The rest of the statute talks about supervision, maintenance, operation, management, or control. I mean, is there any way you're going to stand here and argue with us that the YMCA has that and therefore what we had, we leased, or the contract provided for, I mean, it's... And I understand that. But the point is... If you didn't have it, how does the Chicago Public School have it? The school had the obligation to keep kids from going into the river and accessing and using the river. Let me throw you a softball because I want to get an answer here. Actually, there's some language in the frame that does mention the fact that they did not prevent, there was no rule preventing any of the firemen or cadets from going into the river. That's what I was saying. But it's not mentioned operationally as part of the holding. Well, this is... It's not even quite dictum. It's certainly not overture dictum. But there is that mention which makes one think that you cannot perhaps dichotomize between control over the water and control over the people using it. Well, this goes to exactly my point when I was talking about the court in... I call it Franci... Frane. Frane. Franey. Saying all of those factors that they considered. And I don't think it was dictum. I think they made that a part of their finding that because the fire department was not in any way given the control of access, the right to deny access, that they couldn't have exercised control over the lake involved there. But the question here is, in this case, unlike that case, the YMCA specifically told the school, don't let people go down by the river. Enjoy the land only. Period. And they weren't regulating the river. They were still regulating the people. And that's a distinction, factually, that we have to make. The question becomes, how significant is that distinction? And that's where this little glitch in the language of Frane may be interesting. And I think it's also important to distinguish between access to the river and using it and controlling it in that sense and supervising it in that sense and the overall supervision of the waterways. Can you see the YMCA, when they send out their field trip, scratching their head at the argument that you're making at this point? I mean, it could easily be the YMCA using Chicago property. And is it really taking the position for the YMCA that the people who come on the field trip, that the entity supervising the children on the field trip is responsible for what would be negligence in keeping boats available without plugs in the pontoons? Well, it's different from that. It's that the school has the right to use and access the river. They had the right to do that, and they were told not to do that. They were told to deny their participants access to the waterway, which is completely distinguishable from Frane. Completely distinguishable. Because there, the fire department did not have that right. Here, it's in our contract with the state, and it's attached to the materials we have. I think it's item number seven. Enjoy the river from the land only. Do not enter the river. It's dangerous. So for those reasons, the school had every obligation and access to the river. One more specific, if I might. Where do, in the language of 310, in the exceptions, would that fit? Because it says not owned, supervised, maintained, operated, managed, or controlled by the local entity. What would you say these rights somehow that resided in the school or in the YMCA, by which of these terms is that controlled? Is it supervised, or is it operated, or is it managed, or is it controlled? All four. All four. And anyone who has it. By conditions. Everyone who has riverfront property, Justice Gordon, is in charge of that river. They get to use that river and utilize it and supervise it as it goes by. So that word is meaning. Supervise the river. That word is meaning that those terms are meaningless because any user is doing all of these things. So they could dam the river. They can certainly build a dock out into the river. They can certainly launch boats into the river. Can they build a dock without getting some permit from somebody? It depends on the river and the waterway and how it's regulated. But different landowners on waterways have different rights. And any time those landowners exercise the right to use the river, whether it's draw water from it, fish in it, build a dock in it, drag a boat into it, swim in it. The Fox River Waterway Commission comes along and says no docks, no boats, no fishing, no swimming. And that's the end of it. That's probably already in their regulations that we're not aware of. But I would venture to guess that that's already in place. That the YMCA could not, as you suggest, install a dock at their pleasure. Well, they can launch boats at their pleasure. Launching a boat is not the same. Only because it's tolerated by those who actually manage, control, operate, supervise, and maintain the river. Well, this is why the application of the statute in this case, using 110, does not make as much sense as using 109. And that's exactly why. Because 110, if it's applied that way, negates any liability under any circumstances. Whereas if, like the example that was given, if this group had gone to the YMCA pool and these kids had used a paddle boat in the pool and drowned, or a floaty or something in the pool and drowned, then there would be liability. Yeah, but you know, there's an enormous difference between a pool and the waterways. I mean, I don't think that any of us would debate that point. That the legislature, in its wisdom, has chosen to exempt, at least the way I read it, any local public entity from the river, waterway, whatever. But Wilco and Lawton misconduct is not an exception to that, because there is a difference between our waterways and man-made swimming pools, or person-made swimming pools. There is a difference. Isn't the concept that we're talking about really covered by the phrase in 110, not own, supervise, maintain? Because if you don't have ownership rights, or the right to supervise, or maintain, or manage, or control in the language of the statute, you really don't have the same element of control over the circumstances of the waterway, or pond, or lake, or river, that you would if it was entirely yours to do as you wish. Justice Epstein, I view that as language that pertains to the greater aspects of controlling the river. For example, damming it upstream. For example, closing it to fishing, or closing it to boating. Some of the big arguments we have in this country about the rights to waterways, generally. I don't think YMCA could do any of that. Like, why the Board of Education? He wants to limit the immunity to anyone who does any of these things without necessarily having a right to dam, or to close it off to navigation. Because otherwise, and this was the example that Mr. Rappaport gave, the teacher takes the swim team down to Lake Michigan in December, and 12 kids die. Clearly, that's not the kind of activity that is meant to be immune. It's precisely the kind of activity that's meant to be immune. It's a revenue saver. The immunity legislation that has been passed since the 1970 constitutional amendment is designed with the primary purpose of controlling the public expense. Well, except for in other situations where they have not barred it, and they've given liability where willful and wanton exists, which is why we think that exception should apply here as well, if you don't apply 109. And lastly, let me just address the but-for causation. We don't concede in any way that the plugs caused this accident. There were several other factors, including this. First of all, those boats don't sink. They do not sink. But they slow leak. They take in water when the plugs are absent. That's correct. But they do not sink, period. These boats are like canoes. They're manufactured with the styrofoam in them so that they cannot be sunk. And like a canoe, when it tips over, if you stay with it, you don't drown. You can float on that boat or this paddle boat. Stay with it when? Whenever you want. Under what circumstances are you asserting the significance of staying with it? Under these circumstances. When it lists our capsizes, right? Now, if that's the case, when will it list our capsize? When there's no plug. So how are you going to diminish the significance of the plug as a cause and fact element and ultimately as a proximate cause element to the extent that it has to be a foreseeable phenomenon? Because what was not foreseeable was that these young men would jump into the river. Now, you have to understand the facts of this case. Several people had taken these boats out. The safety? No. Did they jump into the water? No. I'm finishing your sentence. I'm not there yet. I'm not to the good Samaritan part. All right. They had taken these boats out, realized that they were taking on water that still floated, and only one young man out of many decided to abandon the ship and jump into the water, at which point two other people jumped. A gesture which would not have occurred but for the absence of the plugs. Well, it didn't occur with respect to the others. Unless they were a force majeure, like a tornado or a whale, or some event that would substitute for the... Well, you still have to account for the fact that the vast majority of students who took these boats out for a joyride, none of which had boat plugs, all of which took on water, all of which listed, only one of them jumped out. You still have to account for that. Now, call that unforeseeable, call it proximate cause. My point is we don't believe that's the proximate cause, and we believe that the majority of people would have stayed in the boat, and it was unforeseeable that they would abandon the boat. So it means that you're not pleading the case against the YMCA for deleting those plugs from the boats. Well, it means... Because it wasn't the proximate cause. Well, it means that... You don't have to say that. Well, I mean to say as the YMCA's representative, we take the position that the plugs were not the sole proximate cause of this accident. And I wanted to just clarify that. Sole proximate. All right, anything further for you, Mr. Thank you very much for your time. Thank you very much. Mr. Osborne, patiently waiting. Thank you. Your Honors. Mr. Lefkowitz, counsel. May it please the court. If I were to imagine a hypothetical to illustrate the application of Section 3110, I don't think that I could do any better than the actual facts of this case, based simply on the facts as alleged in the underlying consolidated complaint. There's no question that the Fox River is a river. There's no question that the injuries occurred in, upon, or about that waterway. And there's absolutely no question that my clients have no more relationship to the Fox River than they do to the Nile or the Amazon or the Indus. They don't have anything to do with the Fox River. They have a relationship with the students,  How about the fact that they have no permanent residence adjacent to this waterway? And the fact that the case law, in attempting to save its constitutionality, premised its argument on the fact that this was not a special legislation or a denial of equal protection, since it was designed to help indigenous entities approximately located at the river. Well, this statement that you're referencing from McCoy about the special legislation or equal protection, I'm not sure which one it was, obviously meant, late Justice Reed used the phrase, if we could conjure up different groupings, special classifications, that might be susceptible to an equal protection or special legislation argument, then we would look at how this statute benefits local public entities which are engaged in a maritime business, like in that case the Illinois International Port District, as opposed to some school in Peoria or something that you'd have to drive to get to the water. And he simply said, that's not enough of a distinction to raise an equal protection problem. And ironically, it's the plaintiffs and the YMCA in this case, pardon me, that are arguing that you should treat different local public entities differently, and that would seem to feed right into the unconstitutionality argument. And our position is that the statute, by its plain terms, applies to all local public entities. What about 109, though? Why isn't it really the more specific provision? Well, because, and this is a point that I didn't hear referenced either by Mr. Report or Mr. Taylor, and it wasn't addressed in their brief, and it wasn't addressed in the circuit court, and we've made it over and over and over again, and that's this court's decision in Grandalski, which says that 3109 applies to hazardous activities which are conducted, okay, so obviously by the local public entity. So obviously you read this very long statute with the list of, you know, rodeo riding and spelunking and pistol and rifle shooting.  Taylor, excuse me. These are activities that would be organized by a local public entity, and it's obviously encouraging local public entities like park districts to allow these sort of mildly hazardous activities under a qualified immunity. In the Grandalski case, there was a gymnastics class that was being conducted by the local public entity, and then one of the students went off on her own and spontaneously performed a gymnastics maneuver by herself that wasn't part of the activity, and the Grandalski court says 3109 doesn't apply to this. And here we have exactly the same situation. The boating incident, there can be absolutely no question under any inference that the court might want to draw from the complaint that this is something we had nothing to do with organizing, much less permitting. It had nothing to do with the supervision and the contract that provided for a particular amount of supervision that you're not really disputing was not... Well, our duty is in local courts. Why isn't the arrangement made by the school board here, by the local school to contribute or help organize this conference and designate students who should attend and arrange for their room and board at the YMCA adjacent to the server? Why isn't that conducting? After all, the United States conducts drone attacks from 3,000 miles away. You're still conducting. We're not conducting any kind of boating activity. But that's not what this, what 310 emphasizes. It says a recreational activity which creates a substantial risk of injury. Now, if the activity, if there is a proximate cause from the activity, which includes the attendance and the overnight sleepovers for that particular week, is the event that ultimately led to these frolics on the part of some of the students, that can be read as an activity conducted by the school board, which created a substantial risk, depending not on whether it's conducting the activity, but the question is, are they conducting an activity that creates a substantial risk, which belongs, frankly, to the other portions of the argument that we heard, not to the one that you're commenting on. We were conducting an ethical leadership retreat, which consisted of children. If there is liability, if there is foreseeability based on that to create a liability, then it also becomes an event that would give rise to the application of this particular immunity provision, or its non-application. Well, I don't think that the word activity, the word hazardous activity in 3109, is meant to imply this sort of unending chain of causation of whatever. But are you saying it's restricted solely to that portion that involves the immediate context of the injury? Well, let me put it this way. There's certainly nothing inherently hazardous about anything that we plant. Let me put it that way. Even if, and I think Justice McBride made the point in earlier questioning, even if that had extended, let's say, to a boating outing on these paddle boats. Those would generally be questions of fact, even though I asked that question. I think those are generally questions of fact. Whether something would fit into the statutory definition, hazardous recreational activity, is sufficiently broad as a general thought. There would be questions of fact whether this particular activity fits within this definition. Well, I think the court can rule as a matter of law in interpreting a statute as to what the legislature means by a hazardous activity. And I think to follow the reasoning of the plaintiffs and the why, that any kind of boating becomes an ultra-hazardous activity by virtue of the phrase water contact activity. I mean, if you follow that... They only excluded diving from that. Water contact activities except diving. No places where or at a time when lifeguards are not provided. Right, and the kind of specific boating activities that they mentioned are all consistent with the definition of water contact activity that we have urged. It's contained in, I think, some federal statutes, is that where it's reasonably anticipated that the user's or the participant's body is going to be fully immersed in the water. They say surfing, whitewater rafting, kayaking, so on and so forth. Paddle boating is obviously different from that. And I would just say that if you were to interpret the phrase water contact activities to apply to all boating, I mean, then that would essentially subsume 3-1-10 because while we might imagine other kinds of injuries that would happen in, on, or about a waterway, surely the drowning in the waterway would be the one that the legislature was going after there. So I think just to say any and all boating, then why include the list surfing, windsurfing, whitewater rafting? Clearly the legislature is going after a particular kind of nautical activity, not just the paddle boating. But in any event, I think the Grandoski case is the stronger point. I mean, like 3-1-9 doesn't apply. This is outside the scope of the activity that we plan. So it's not a matter of prompting? It doesn't even apply. Right. They can both coexist. Certainly. They apply to different kinds of things. Now, what would you say if we had a clearer factual realization of conducting activities? At that point, would you yield to 1-0-9 as being the more specific over 1-10? Well, I suppose I'd have to imagine the hypothetical facts of boat race or something. You conduct them. Right. To answer your question, 3-1-9 does mention, for example, boat racing. That's something that happens in and out of Waterway. So if it was a boat race that was put on by the local public entity, I could certainly see where you would want to apply 3-1-9. But in this case, even if 3-1-9 applies, I think 3-1-10 is clearly the more specific because this is the non-proprietary maritime risk. It doesn't include any of these dry land risks, rodeo riding or hang gliding or any of these other things that 3-1-09 applies to. It simply applies to the maritime risk and then accepts out those maritime risks which are proprietary to the local public entity, like a lagoon in a local park, which there are other sections of the Tort Immunity Act which would apply. This seems to apply directly to this set of facts. Like I said, I can't imagine a better illustration for 3-1-10. But this section doesn't talk about conducted by. It talks about hazardous recreational activity means activity conducted on. And that case that you were referring to used by, didn't it? It was interpreting 3-1-10. It didn't use the language of the statute. It said conducted. And it interpreted the word conducted to mean conducted by the local public entity. But the language of the statute actually says conducted on. It doesn't say conducted by. Conducted on property of the local public entity. Conducted by. You're reading in the word by. And they're continuing with the word conducted by, so on and so on. Fair enough. Fair enough. But in the Grandolski case, you know. Yeah, they implied that. It was right next to the, you know, the class that was taking place. The word conducted refers to the entity that is being sued. Well, but I think if you look further down and you look at this list of specific examples that they're giving in 3-1-09, these are all organized activities. You know, this isn't just something that happens. This is something that a local public entity would put on. Or that someone who came out of their land would put on. With respect to this business about leasing the camp to the school defendants, that's not pled. That was actually raised for the first time in a motion to reconsider after the judgment was entered. So I don't think that's even preserved. And, by the way, I mean you can also look at the contract. And it's obviously a license and not a lease. We're only using two buildings out of this very large camp. And anyway, even if we've got all of Camp Algonquin, let's say, the injuries happened in the river. The Fox River is a navigable river. It's clearly established that it is the property of the state of Illinois, subject only to whatever rights the federal government might have to, you know, send a battleship down it one day if they want to. But it's not the YMCA's property. It's not our property, even if they leased the entirety of Camp Algonquin. So no matter how comprehensive their regulation of the users may be, it would not be included in the exception to 110 as something that reflects control over the waterway. Right. I think if anybody had a good argument on that, it would be the plaintiff in the McCoy case, or the Frame case. Well, I've indicated what the glitch in the McCoy case, which doesn't seem to stop. It didn't stop while you were ahead. It made the distinction between regulating the people versus regulating the actual river, but then went on to say there is also no regulation of the people, as if that was still something of some concern. Well, I thought you were referencing Frame, which was the firefighter. Right, yes. Well, in that case, the discussion that went earlier was with regard to the supervision of the landowner over the firefighter who drowned, I think. I think in that case, the key was the ownership of the fire departments, the local public entities, control, supervise, maintain, so on, with respect to the lake. There's absolutely no question. I mean, fire departments are very hierarchical outfits. If the fire chief tells you to get out of the lake, you get out of the lake. So there's no question that those local public entities supervised the participants. Would that matter to you? Obviously, it didn't matter to Frame. Well, it's not that obvious because Frame was so compelled to cover the fact that they did not exercise any restraints on the users. No, I think, and I read Frame last night, they're talking about the club owners exercising restraints over the firefighters, and they said they were merely guests. They were merely guests. Same here. We're guests on the YMCA. But it is an irrelevant consideration if we were to adopt your characterization. Yes, exactly. And that's why I said the plaintiff and Frame had a much better argument than they have here because there was direct eyes on supervision. They were all right there at the lake telling everyone who to partner up with and how to dive and when to get out of the water and so on and so forth. I mean, that's supervision. If that was enough to trigger the term supervision in 3.110, certainly they would have it there. And the McCoy case is a better case. But the issue still, the major issue is still a question of determining between the operational validity or applicability of 1.09 over 1.10, and that seems just to hang on this Gronowski distinction. No. Do you have some other arguments? Yeah. We make several other arguments. It's not an inherently hazardous activity, which I think we pointed out, that even if it's – if the plugs were in the boats, okay, if the plugs had been left in the boats, then obviously this wouldn't have happened. They would have gone out and done their little thing, and they would have come back and snuck back into the dorm and gone to sleep. I mean, this is not – these boats were donated by the Lincoln Park Zoo. Well, that would not impact on the applicability of 1.10 over 1.09, but it would apply to the application of 1.09 on the basis of its own terms. Absolutely. And so, yeah, the only argument that we can make, assuming that 1.09 applies, which is what you're essentially asking, assume for purposes of argument that 1.09 applies, Section 3.110 is one sentence long. It applies to a single sentence. Unless you have other arguments to point us in the direction of having 1.10 trump 1.09. Right. It's more specific. It's more specific. And in the Murray court, 3.109, they pointed to the fact that the trampolining is actually a part of 3.109. I mean, paddle boating is not part of 3.109, nor is boating generally. I mean, if it was, like I said, 3.110 wouldn't mean much. So 3.110 – And it's not a water contact activity as such? No, it's not a water contact activity because it's not anticipated, it's not intended as a part of the activity. I mean, obviously, in any lawsuit, it's because somebody drowned. But the activity that's intended is that you sit in the paddle boat and you stay dry. I mean, like I said, there are pictures of these in the record. This is something you wouldn't hesitate to look at. It's an activity which you perform on the water. Right. Does the fact that there is a partition between the skin of the user and the wetness of the water, is that what's involved in water contact? Yeah. Or is the fact that you're sitting in a boat or surfing, if it's only, for example, your skis that come into contact with the water? Water contact activity is a term of art that's used in pollution regulation. And it's essentially meant to apply to a situation where you might get bacteria or giardia or something because you're in the water, you need to wear a wetsuit. I mean, we point out some regulations in some park districts where they allow boating, but they prohibit water contact activities. So just sitting in a boat is not allowed. You don't have any specific case on that? We mentioned a few cases. I think the Bernadine case that they rely on from the Supreme Court for water contact activity cited two decisions from the Illinois Pollution Control Board. And we cited those and explained why this only applies to immersion kind of activities. There's a federal statute that applies to water contact activities in the pollution context. There are a few other scattered statutes. There's not much on water contact. But if you meant to say, if the legislature meant to say, any injury occurring in or about a waterway, for example, then they would have said that because they said that in 3.1.10. So water contact activities obviously means something else. Anything further you want to address, Mr. Osborne? Certainly. If there's nothing more on the statute, I would briefly just like to address Wilflin-Wanton and their proximate cause, although I don't believe the court needs to reach it. Their theory is basically because we were negligent or Wilflin-Wanton in letting these kids out of the dorm, then whatever happened after that was foreseeable. But I think every case to consider Wilflin-Wanton in the context of supervision has said that mere failure to supervise alone isn't Wilflin-Wanton. What about the complete absence? Doesn't the complaint allege that there were no chaperones in these cabinets? The complaint alleges that there was one chaperone in the state that was there. But the ratio was breached. I don't believe that they allege specifically the numbers. We did have eight to one chaperones. There's no getting around that. There were a number of participants there. But I think their theory is that the chaperones were not vigilant enough. They didn't stay up all night. I thought it was an allegation that there was absolutely no supervision at all. They said that there was not a chaperone sleeping in that cabin with... They said all but one of the adults stayed in the Highland House, which was a separate building. That means one of the... So the house where the students left was not chaperoned? It was. There was one adult, and they do allege that there was one chaperone who stayed with them. Yes, absolutely. So I don't think that comes anywhere near Wilflin-Wanton because there's an intervening act here. It's the same argument with respect to... You're not urging that the failure to supervise will never reach a level of Wilflin-Wanton? I only have the facts of this case. Because there are ample cases that will hold that a failure to supervise can degenerate to Wilflin-Wanton disregard. I think the best case is the nap case where the shop teacher told all the kids to stay in class and let two kids out to go park their cars. Well, that's where one jumped on top of the other. Yeah, one snuck out. It's a sneaking out thing. I mean, that's perfectly analogous, I think. Perfectly foreseeable. Well, it was not foreseeable. No, but for anyone with teenagers, sneaking out is certainly something we... Well, yes, but I mean, there are a number of cases that talk about that. There's the kid left at home case, and then there was the swimming accident, and they said, well, you know, the parents might have known. Again, our case of supervision is not per se outside of the reach of Wilflin-Wanton. But the complaint here is very detailed, and I think the court can read this and see exactly what's going on here. This is not something that we permitted or encouraged or allowed them to do. Our duty, as I said before, is in loco parentis. It would be an extraordinary parent, even if they knew that their teenager was prone to sneak out or had snuck out before, to stay up all night and watch them. That would be extraordinary. Everybody sleeps, even chaperones, even parents. Well, presumably that might engender an issue of fact. In this particular case, we have an earlier event four days before. But the sneaking out did occur. Let's assume that it occurred every night following until the 14th. Then it may very well be a duty to stay up all night. They didn't let you have a complaint. They alleged a knew or should have known, I think, which is, you know, basically we should have interrogated the kids and found out from them that they were sneaking out. Again, it's a common situation for parents and teenagers. I think that that's really beyond what Wilflin-Wanton is meant to address. So, are there no other questions? Thank you, sir. Thank you. Any final words from the appellant? Yes, I have a few, Your Honors. Some points of clarification. A question came up most recently about what exactly is alleged. The 8 to 1 ratio is alleged. Violation of it is alleged. You find it in paragraph 22 of the consolidated complaint and other places. The fact is there was one adult that slept at the ward house and it should have been formed. That's the bottom line on that. It was one of the things that came up. Let me look at you each and say I know you've been quite patient and quite generous with your time. You may have other questions. I know we've aired out quite a few. I'm certainly happy to address anything else. If not, I would just conclude, I think, where I began by saying that, in my opinion, the result here should turn really on two things that are at the center of all this. Section 2109, which we believe applies based on its plain language. How about the Gronowski? Oh, yes. Thank you very much. I meant to speak directly to Gronowski and I have it right here. Gronowski is not applicable. First of all, the Gronowski court ruled that there was no willful wanton misconduct as a matter of law. That should not be the ruling here. Secondly, with respect to 2109, they ruled that we were not dealing with a hazardous recreational activity in that case. They don't speak to the question of whose premises it is on. Don't they speak to the question of whether the activity was conducted by the defendant? Well, they do. Give emphasis to that as an element? Well, what was conducted here by the defendant was a one-week retreat at a camp sitting on a river. Just because I asked it as a devil's advocate doesn't mean I believe that. No, I understand. Listen, I put no stock in any question. We'll know what you all think when you make your ruling. And not before that, I'm sure. But I'm here to try to be as helpful as I can with the court, and I stand on the view that Judge McWilliams made a mistake, that 2109 does apply, that 2109 is in fact Trump, that there should be a reversal of the order of the dismissal for that reason and the logic of the Illinois Supreme Court when it used 2109 to Trump 108 back in the days when 108 was an absolute immunity. Fits like a glove. Thank you very much. Thank you, Mr. Rett. Any final words, Mr. Cooley? No, thank you very much. Good rebuttal arguments. Good arguments overall. Thank you all for a very fine presentation. We'll take it under advisement. We'll issue a ruling in due course. Very helpful briefs.